PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIMMY MYRICK,

*Plaintiff-Appellee,*

v.

PRIME INSURANCE SYNDICATE,
INCORPORATED,

*Defendant-Appellant.*

No. 00-1726

Appeal from the United States District Court
for the District of South Carolina, at Aiken.
Cameron McGowan Currie, District Judge.
(CA-98-3688-1-22)

Argued: February 28, 2001

Decided: January 26, 2005

Before WIDENER, NIEMEYER, and LUTTIG, Circuit Judges.

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Widener wrote the opinion, in which Judge Luttig concurred. Judge Niemeyer wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Thornwell Forrest Sowell, III, SOWELL, GRAY, STEPP & LAFFITTE, L.L.C., Columbia, South Carolina, for Appellant. John Frank Hardaway, Columbia, South Carolina, for Appellee. **ON BRIEF:** Allen Jackson Barnes, SOWELL, GRAY, STEPP & LAFFITTE, L.L.C., Columbia, South Carolina; Scott Seelhoff, HOWELL,

GIBSON and HUGHES, Beaufort, South Carolina, for Appellant. Robert A. Muckenfuss, MCNAIR LAW FIRM, P.A., Columbia, South Carolina, for Appellee.

**OPINION**

WIDENER, Circuit Judge:

Prime Insurance Company (Prime) appeals the district court's refusal to grant its motion for judgment as a matter of law, renewed motion for judgment as a matter of law, and relief under Rules 59 and 60 of the Federal Rules of Civil Procedure following a jury verdict in Jimmy Myrick's (Myrick) favor for breach of contract and a bad faith cause of action under South Carolina law. It also appeals jury consideration of the district court's grant of sanctions, attorney's fees, and prejudgment interest. For the reasons that follow, we affirm in part and reverse in part the decisions of the district court and remand the case for proceedings not inconsistent with this opinion. Because we decide on the merits all necessary points raised, we do not address Rules 59 and 60.

I.

In May 1998, Jimmy Myrick and Donald Brandt planned to start a logging business with each other. Entry into the logging business requires three pieces of equipment: a fellerbuncher, a skidder, and a loader.[1] Brandt already owned a skidder (Model Franklin 170) and a fellerbuncher (Model 311C Hydro-Ax). Myrick bought a loader (Hood Model 2400) in June 1998 in anticipation of this venture.

Greg Matthews (Matthews), a local insurance agent for American Interstate Insurance Company (American Interstate), helped set up general liability and workers' compensation insurance for the new business, but American Interstate did not write the required kind of

---

[1]A fellerbuncher saws or "fells" trees and gathers the logs into bunches. A skidder hauls trees out of the woods. A loader loads them onto a truck.

property and casualty insurance; Matthews therefore contacted John-son Insurance Associates (Johnson Insurance) to place this coverage. Johnson Insurance, in turn, contacted MGA Insurance Company, which issued the insurance effective June 28, 1998. Soon after, Myrick and Brandt decided to abandon the venture, and they canceled this insurance without penalty. The three pieces of equipment insured were the Franklin skidder, the Hood loader, and the Hydro-Ax feller-buncher.

Myrick subsequently, later in the summer of 1998, decided to enter business on his own, and he called his new business Palmetto Timber Products. Because he already owned a loader, he only needed to acquire a fellerbuncher and a skidder for his business. Myrick bought a used Model Barko 775 fellerbuncher on July 30, 1998 for $42,000 and spent $8000-$9000 to repair the engine to place it in service. He also acquired a Model Timberjack 450A skidder in August 1998. Myrick hired Caroline Harper Rivers as Palmetto's secretary. He then called Matthews to arrange insurance on his three pieces of equip-ment.

Matthews again indicated he could not write the insurance; he would have to refer the insurance request to Johnson Insurance. Myrick told Matthews the three pieces of equipment to insure and that his secretary, Mrs. Rivers, would give him the required serial num-bers. Matthews stated that he would provide the pertinent information to Johnson Insurance, including the serial numbers for the three pieces of equipment. Conflicting stories emerged at trial regarding which serial numbers were relayed to Matthews. Mrs. Rivers testified that she telephoned Matthews the following serial numbers:

    17109 — Barko 775 (fellerbuncher)
    355147 — Timberjack 450A (skidder)
    243399 — Hood 2400 (loader)

Matthews testified that Mrs. Rivers may have telephoned only the addition of a new skidder, and also that he was uncertain whether it was Myrick who called him, or Myrick's secretary, Mrs. Rivers.

A fax dated June 25, 1998 from Myrick to Matthews was produced at trial. The document originally was sent by Myrick to Matthews

regarding insurance for equipment of the abandoned joint venture. Handwritten notations by Matthews replace the skidder from the Franklin 170 Model to the Timberjack 450A model. No notations regarding the loader and fellerbuncher were made. On September 2, 1998, Matthews relayed Myrick's request for insurance and forwarded the fax with his notations to Johnson Insurance.

Woodrow Wilson Power, Jr. (Power), a producer[2] for Johnson Insurance, filled out an application for coverage from Prime on a scheduled,[3] inland marine[4] insurance policy with the information he received from Matthews. The application for insurance scheduled the following items:

> 355147 — Timberjack 450A (skidder)
> 311C2377 — Hydro-Ax 311C (fellerbuncher)
> 243399 — Hood 2400 (loader)

This application listed Brandt's Hydro-Ax fellerbuncher—the one Brandt owned for purposes of the abandoned joint venture. Myrick did not own this fellerbuncher. He never saw the completed application. Neither party disputes that the effective date of the policy of insurance was September 2, 1998 for the listed equipment.

---

[2]A producer is the person who processes insurance applications.

[3]A scheduled policy only insures items specifically described and for the listed values.

[4]"Inland marine" is a broad category of insurance that encompasses a range of specific risks. One treatise states:

> It is generally acknowledged to have originated in inland shipping, covering the risks of navigation on lakes, rivers, and canals. In the early part of the twentieth century, the term was expanded to include risks of transportation on land (including such transportation-related structures as bridges), and now encompasses "transportation" in the form of electronic or similar communication. The addition of special policies adapted to a wide variety of particular risks, many of which are in the form of floaters, renders this classification so broad that it is impossible to define the term with exactness.

*Couch on Insurance*, § 130 (3d ed. 1997).

On September 16, 1998, Myrick's Barko 775 fellerbuncher was destroyed by fire prior to his receipt of any verification information regarding the insurance. Myrick called Matthews that day to tell him of the loss.

On September 17, 1998, Prime learned of the loss, and Myrick received a letter from Johnson Insurance requesting premium payments and attaching certificates of insurance. Conflicting stories emerged regarding which certificates of insurance were included. Myrick stated that certificates were included only for the loader and the skidder. Mrs. Waller, of Johnson Insurance, stated that her file indicated that three certificates had been sent out on September 11, 1998—including one for a Hydro-Ax fellerbuncher.

On September 18, 1998, Power called Prime and indicated in a voice mail to Rick Lindsey, Prime's President, that the destroyed fellerbuncher was not the scheduled fellerbuncher.[5] Prime then sent Mitchell Bazen (Bazen), an independent adjuster, to investigate the claim. Bazen concluded that the fellerbuncher destroyed by the fire was not scheduled in the policy.

On September 21, 1998, Myrick paid his premium. On September 28, 1998, Lewis Hansen (Hansen), claims manager for Prime, wrote to Myrick denying coverage for the Barko 775 fellerbuncher. Hansen stated that an insurance contract existed between the parties,[6] but that the insurance policy listed a 1985 Hydro-Ax 311C fellerbuncher instead of a 1989 Barko 775 fellerbuncher.

On October 6, 1998, Myrick received an insurance certificate for a Hydro-Ax fellerbuncher, with Brandt, a loss payee. Myrick subsequently scheduled a 1989 Hydro-Ax 511B fellerbuncher effective on October 29, 1998, and the premium increased.[7]

---

[5]In the message, Power stated, "On that claim we sent yesterday I think we may be out of that thing because when he called me with details of that piece of equipment, we don't insure nor have we ever insured . . . ."

[6]At trial, Prime also conceded that an insurance contract did exist, but that the destroyed fellerbuncher was not a scheduled item.

[7]This Hydro-Ax model was not the piece of equipment that Brandt owned.

After the denial of the claim, Myrick complained to the South Carolina Department of Insurance about Prime's failure to investigate the claim, explaining that he had no interest in the fellerbuncher listed in the policy. South Carolina forwarded the letter to Prime, and Prime responded to the letter. South Carolina subsequently wrote to Myrick indicating that it was taking no further action.

On December 11, 1998, Myrick filed a two-count complaint in South Carolina state court alleging breach of contract and bad faith. Prime removed[8] the action to the district court, answered the complaint, and filed a counterclaim for a declaratory judgment regarding its non-liability under the policy because the destroyed fellerbuncher was not scheduled on the policy.

During discovery, Prime did not produce its complete underwriting and claims file to Myrick. The request for the file was the subject of a Motion to Compel filed by Myrick on April 5, 1999. Prime produced a part of the files, but during a subsequent deposition, Myrick discovered that a tape recording, and electronic information had not been produced. The tape had not yet been transcribed, and thus was not part of the file initially. Additionally, the other information was housed on the hard-drive of a computer, and Prime stated that it inadvertently forgot to print the information out. Before trial, and upon a motion for sanctions, the district court imposed sanctions and allowed Myrick to question Prime's witnesses before the jury regarding the failure to disclose the documents immediately.

On July 19, Prime moved for summary judgment because Myrick's Barko 775 fellerbuncher was not scheduled under the policy. Prime's motion was denied, and the matter was tried on February 10 and 11, 2000. At the close of the plaintiff's case, Prime moved for judgment as a matter of law. The court denied the motion. The jury returned a verdict in favor of the plaintiff for breach of contract and awarded $50,000 in damages. It also found in favor of the plaintiff on the cause of action for bad faith and awarded $250,000 in punitive damages.

---

[8]Prime removed pursuant to 28 U.S.C. § 1441 as is permissible because federal jurisdiction was established by the parties' diversity of citizenship.

The district court entered judgment on the jury's verdict, and Prime moved for a new trial or judgment as a matter of law on February 18, 2000. On April 5, 2000, the district court denied the motion. The district court granted Myrick's unopposed motion for prejudgment interest and attorney's fees. The district court calculated interest on the $50,000 judgment from September 16, 1998 to February 14, 2000 at an interest rate of 8.75% per year, a total of $6,114.90. The attorney's fees and costs added an additional $21,487.16 to the verdicts.

Prime subsequently moved the district court for an order, pursuant to Rules 59 and 60 to alter or amend the court's April 5 order. A hearing was held on May 16, 2000, and the court denied Rule 59 and 60 motions. The court then entered a second amended judgment on May 16, 2000, which reaffirmed the jury verdict for actual and punitive damages, prejudgment interest and attorneys' fees. Prime timely appealed from this order.

## II.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We review a district court's denial of a motion for judgment as a matter of law and renewed motion for judgment as a matter of law de novo. See *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999). If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered. See *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988). If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied. See *Hofherr v. Dart Indus. Inc.*, 853 F.2d 259, 261-62 (4th Cir. 1988). In making this determination, we review the evidence in the light most favorable to the nonmoving party. See *Hofherr*, 853 F.2d at 261-62.

### A.   Breach of Contract

We first address whether the district court erred in denying Prime's motion for judgment as a matter of law and renewed motion for judgment as a matter of law on Myrick's breach of contract claim. The *only* instructions given to the jury with respect to the breach of con-

tract count and as to the agency relation of the various people connected with this claim were in the special verdict form and instructions appearing below, to which objection was not and is not made:

    1.   As to the claim for breach of contract, we, the jury, unanimously find:

          \_\_\_\_\_ for the defendant

          \_\_\_\_\_ for the plaintiff[9]

---

[9]The completed special verdict form follows:

1.   As to the claim for breach of contract, we, the jury, unanimously find:

      \_\_\_\_\_ for the defendant

      __X__ for the plaintiff

If you found for the defendant, sign and date the verdict form now. If you found for the plaintiff, go to question 2.

2.   As to the claim for breach of contract, we, the jury, award actual damages in the amount of Fifty Thousand and No/100-------------------(50,000.00).

If you awarded actual damages to the plaintiff, go to question 3.

3.   As to the claim for bad faith, we, the jury, unanimously find:

      \_\_\_\_\_ for the defendant

      __X__ for the plaintiff

If you found for the defendant, sign and date the verdict form now. If you found for the plaintiff, go to question 4.

4.   As to claim for bad faith, we, the jury, unanimously find, by clear and convincing evidence, that the plaintiff is entitled to punitive damages.

      \_\_\_\_\_ No

      __X__ Yes

If you answered "No" sign and date the verdict form now. If you answered "Yes" go to question 5.

And as to the breach of contract claim and agency, the court instructed the jury:

I will now instruct you on the rules of law that apply in this case. Plaintiff has two claims or causes of action. The first claim is for breach of contract. In order for the plaintiff to recover under a breach of contract theory the plaintiff must establish three essential elements by the greater weight or preponderance of the evidence.

One, that the parties entered into a binding insurance contract under which the defendant in return for the plaintiff's timely payment of insurance premiums agreed to provide insurance for the plaintiff. Two, that the defendant breached or unjustifiably failed to perform under the insurance contract. And three, that the plaintiff suffered damage as a direct and proximate result of the breach.

An insurance broker is primarily the agent of the person first employing him, and where the broker is employed to procure insurance, he is the agent of the insured. However, whether the broker represents the insured or the insurer depends upon the facts of each case.

The fact that a broker may receive a commission from the insurer for placing insurance does not change his character as agent of the insured when he is employed by the insured. Moreover, a broker acting solely on behalf of the insured has no authority to bind the insurer. An insurance agent who is an agent of the insured can be converted into an agent of

---

5.   As to the claim for bad faith, we, the jury, unanimously award punitive damages in the amount of two hundred fifty thousand and no/100- ($250,000.00).

Charles S. Smith
Foreperson

Aiken, South Carolina
February 11, 2000

the insurer where there is evidence which creates an inference that the broker was acting at the instance or request of the insurer.

A party asserting agency as a basis of liability must prove the existence of the agency by the greater weight of the evidence, and the agency must be clearly established by the facts. The test to determine agency is whether the purported principal has the right to control the conduct of his alleged agent.

Agency may not be established solely by declarations and conduct of the alleged agent, but such declarations and conduct are evidence which you may consider in connection with other evidence that may establish the alleged agency. Agency may be proved by circumstantial evidence showing a course of dealing between the parties.

The authorized acts of an agent are by their nature the acts of the principal. By operation of law an agent's exercise of authority is regarded as the execution of the principal's continuing will. An agent conducting business with the authority of the principal binds the principal to the same extent as if the principal personally made the transaction. The principal would be directly liable to the third party on the transaction. In other words, the law considers that what a person does through his agent he has done himself.

A principal may be liable to third persons for fraud, deceit, concealment, misrepresentation, negligence and other malfeasance and omissions of duty of the agent acting within the scope of the agency although the principal did not authorize, participate in or know of such misconduct.

The relationship of agency need not depend upon express appointment by the alleged principal and acceptance by the purported agent. Agency may be implied from the words and conduct of the parties and the circumstances of the particular case.

The facts of this case establish that Myrick sought insurance for *a* fellerbuncher and that Prime intended to insure *a* fellerbuncher owned by Myrick. The facts further show that, during the relevant time period, Myrick only had an interest in *one* fellerbuncher—namely, a Barko 775 Model. In its answer and at trial, Prime admitted that a policy for insurance existed between Prime and Myrick. There was also no dispute that this policy of insurance covered a loader, a skidder, and a fellerbuncher for Myrick's company. It was also undisputed that the fellerbuncher named in the policy was Brandt's Hydro-Ax Model and not the Barko 775 Model that Myrick owned. Because Prime conceded that a policy for insurance existed between the parties, this case hinged on whether the erroneous description[10] of the fellerbuncher was material to the risk involved in this scheduled policy.[11]

Under South Carolina law, an erroneous description of property in an application for property insurance may avoid coverage when the erroneous description is material to the risk. See *Hinson v. Catawaba Ins. Co.*, 78 S.E.2d 235, 236 (S.C. 1953) (holding that premium rate one-third less than what would have been charged if address had been correct was material to risk and barred formation of a contract because the minds of the parties did not meet). The question of materiality is for the jury to decide unless the record conclusively estab-

---

[10]We characterize what occurred in this case as a misdescription because the record reveals that Myrick owned only *one* fellerbuncher. This *fact* makes the schedule description in this case no different than a situation in which the wrong model year was listed because there can be no confusion as to which piece of equipment is referred to in the schedule—*i.e.*, Myrick's only piece of equipment. That we happen to know that the listed equipment actually refers to another identifiable piece of equipment does not alter this characterization.

[11]Because we address the motion for judgment as a matter of law based on the existence of the written policy, we need not address the agency questions bound up in the issue of whether an oral contract existed between the parties. We also note that the jury was not charged on materiality, and neither party requested the court to instruct on it. In a discussion regarding the subject, the court stated that the case was "just going to have to come down to whether the jury believes that there was a significant enough variance to warrant the decision to deny coverage." The jury returned a special verdict form that stated there was a contract that was breached.

lishes that the misdescription materially affected the risk assumed by the insurer. See *Lanham v. Blue Cross & Blue Shield, Inc.,* 526 S.E.2d 253, 255-56 (S.C. Ct. App. 2000).

Prime argues that any misdescription in a scheduled policy bars coverage. We disagree. Although we recognize that the policy stated, "This policy covers the property described in the Commercial Inland Marine Schedule," Prime has not offered South Carolina authority holding that any erroneous description in a scheduled policy bars coverage. We decline to hold that the South Carolina courts would so hold.

Because South Carolina has not held that any erroneous description bars coverage under a scheduled policy, we examine the evidence to determine whether the jury could have concluded that the erroneous description was not material. The jury heard evidence from Roger Day (Day), the Vice President of Prime. In response to a hypothetical question regarding whether an erroneously described fellerbuncher under a policy could still be covered, Day testified, "Coverage could exist where an error has been made that was not material to the risk and the bargain as a hypothetical matter." Power testified that the premium amounts in the policy were based on the value of the equipment. Specifically, he stated that the insurance value is "a rough indication of what the actual cash value on the property is." Myrick testified that he paid $42,000 for the used fellerbuncher and put into it approximately $8,000 or $9,000 in initial repairs to ready the machine for service. The policy provided coverage for up to $50,000 —the total price Myrick paid for the Barko 775 fellerbuncher. The jury could have reasonably concluded that Prime did not have an increased risk because the insured amount was the actual cash value of the Barko 775 fellerbuncher. Based on this information, it was not unreasonable for the jury to conclude that a misdescription of the fellerbuncher in the policy did not make a material change in the policy. Indeed, in denying the defendant's motion because materiality had not been conclusively established, the district court correctly observed based on the evidence presented at trial, that "the two [fellerbunchers] were comparable [and] . . . there was no increase in risk by the addition or the substitution . . . of the second fellerbuncher, and therefore there does not appear to be a material change in the policy."

Because a jury looking at the evidence presented to it could conclude that the erroneous description of the fellerbuncher was not material to the risk of the insured in the policy, we affirm the district court's denial of Prime's motion for judgment as a matter of law as well as its renewed motion for judgment as a matter of law. The judgment of the district court on the verdict of the jury awarding $50,000 to Myrick for Prime's breach of contract is accordingly affirmed.

In this connection, we should say that it is perfectly apparent from the statement of facts in Part I of this opinion that somewhere along the line the Hydro-Ax fellerbuncher owned by Brandt and previously insured by Myrick and Brandt through Matthews and Johnson Insurance got placed in the schedule of the insurance policy involved in this case due to some mixup, the exact nature of which is not disclosed in this record. The jury had to believe that three pieces of equipment were included, as shown by the testimony of Myrick and Myrick's secretary, otherwise there could have been no policy which admittedly existed. But whether the correct information was given by Mathews to Power, of Johnson Insurance, who filled out an application and gave it to Prime Insurance, the record does not disclose. A mistake was made somewhere, but where the record does not show. And no instructions on the law, other than those we have set forth above, were given to the jury or requested. Thus, the matter was left entirely in the hands of the jury, so the only real and fundamental question is whether or not the evidence supports the verdict. We hold that it does.

## B.    Bad Faith

We next address whether the district court erred in denying Prime's motion for a judgment as a matter of law and renewed judgment as a matter of law on Myrick's bad faith cause of action. We conclude that it did.

Under South Carolina law, an insured may assert against his insurance company a cause of action for the breach of implied covenants of good faith and fair dealing. See *Nichols v. State Farm Mut. Auto. Ins. Co.*, 306 S.E.2d 616, 619 (S.C. 1983). This obligation includes a good faith duty to investigate the claim. See *Flynn v. Nationwide Mutual Ins. Co.*, 315 S.E.2d 817, 820 (S.C. Ct. App. 1984). The ele-

ments of an action for breach of the covenants of good faith and fair dealing in an insurance contract under South Carolina law are: 1) the existence of a mutually binding contract of insurance between plaintiff and defendant; 2) a refusal by an insurer to pay benefits due under the contract; 3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing in the contract; 4) that causes damage to the insured. See *Cock-N-Bull Steak House, Inc. v. General Ins. Co.*, 466 S.E.2d 727, 730 (S.C. 1996) (enumerating the elements of a claim for bad faith refusal to pay benefits under an insurance contract). If the insured proves the insurer's conduct was willful or in reckless disregard of his rights under the contract, the insured also may recover punitive damages, but if there is a reasonable ground for contesting a claim, there is no bad faith. See *Crossly v. State Farm Automobile Ins. Co.*, 415 S.E.2d 393, 397 (S.C. 1992).

Prime has admitted that there was an insurance contract in effect in this case,[12] and Prime did refuse to pay under it. The question we address here is whether under South Carolina law, there was cause to send the issue of Prime's bad faith to the jury. The Supreme Court of South Carolina has held that "[i]f there is a reasonable ground for contesting a claim, there is no bad faith." *Crossley*, 415 S.E.2d at 397. We are of opinion and hold that existence of the scheduled policy in which the destroyed fellerbuncher was not listed provided a reasonable ground to Prime to deny the claim. Therefore, we should reverse the district court's refusal to grant judgment as a matter of law on this claim unless Prime violated a duty to investigate this claim. See *Flynn*, 315 S.E.2d at 820.

Evidence produced at trial established that the fellerbuncher listed in the policy was not the fellerbuncher that burned. On September 18, 1998, Power left a phone message to Prime indicating that the fellerbuncher that burned was not the item listed in the policy. Bonnie Clark, the Claims Coordinator for Prime, then sent a letter to Bazen, an independent adjuster, requesting him to investigate and to verify

---

[12]In Prime's opening statement, counsel stated, "we don't contradict that there was an insurance contract in this case. As a matter of fact, we admit that there's an insurance contract, and we agree that it ought to come into evidence."

the year, model, make, and serial number of the destroyed equipment. At trial, Power testified that the report of Bazen concluded that the Hydro-Ax fellerbuncher named in the policy was not, in fact, the Barko 775 model fellerbuncher that was destroyed by fire. A letter introduced at trial that was sent by Hansen, Prime's Claims Manager, to Myrick denied coverage on this ground. Specifically, the letter stated:

> The schedule of the insurance policy listed a 1985 Hydro Ax 311C Fellersbuncher [sic] with a serial number of 243399. The damaged machine that you have reported was a 1989 Fellersbuncher [sic] which is a different machine entirely than the one that you have insured because it was a different year model (1989) (Barko 775)) [sic] and had a different serial number of 17109 . . . . [This] lead[s] us to the logical conclusion that Prime Insurance Syndicate Inc. [should] deny coverage to this case based upon the facts we are aware of at the present time.

Prime adequately investigated the claim and closed its investigation upon receipt of Bazen's report. This was an adequate investigation under the circumstances. Although a jury ultimately found Prime liable on the policy because of the erroneous description, we cannot hold that its actions in investigating the claim were done in bad faith. The same remarks we made above with respect to who caused the mistaken description in the policy and why it was caused apply here. Even after a two-day trial when all of the people involved testified, the record is uncertain as to exactly what happened. The district court made no finding to that effect, and neither do we. On this record the insurance company should not be held to have more or different information than that disclosed at trial, which does not support a finding of bad faith. Accordingly, the judgment of the district court entering judgment for the plaintiff on the special verdict claim for bad faith is reversed.

For the same reasons, we also conclude that Prime's conduct was not willful or in reckless disregard of Myrick's rights under the contract. Accordingly, we remand the case to the district court with instructions to vacate the jury's award of $250,000 in punitive damages.

### III.

We discuss briefly the other points raised in this appeal.

The district court awarded $6,114.90 in pre-judgment interest. In South Carolina such an award of pre-judgment interest is a proper element of damage in the discretion of the trial court. *Jacobs v. American Mut. Fire Ins. Co.*, 343 S.E.2d 142, 143 (S.C. 1986). We are of opinion and hold that the district court did not abuse its discretion in this award.

The district court awarded attorney's fees and costs in the amount of $21,487.16 to the plaintiff. Such an award is by virtue of S.C. Code Ann. § 38-59-40(1)(1989 & 2000 supp.). This Code section provides that such an award of attorney's fees be made upon a refusal by an insurance company to pay within 90 days "without reasonable cause or in bad faith." Because we have vacated the judgment for bad faith, and are of opinion that the fact that the fellerbuncher burned was not the same fellerbuncher appearing in the policy was a reasonable cause to deny payment, the award of attorney's fees is vacated.

The only objection to the introduction of evidence preserved on appeal was that the district court permitted the jury to consider its decision holding Prime guilty of failing to comply with discovery rules. While this is a question of relevance, Prime takes exception because it claims that such was "not relevant to Prime's decision to deny coverage," and complains of permitted argument that such was "evidence of bad faith." Br. p.4. While such evidentiary rulings as to relevance are within the discretion of the district court, and this was discretion on top of discretion in awarding sanctions, we express no opinion on the question raised here because, even if erroneous, any error was harmless because we have decided Prime's decision to deny coverage was not made in bad faith and was reasonable. So the objection is dismissed as moot.

### IV.

The dissent is based largely, even if not wholly, on its definitely implied, although not openly advocated, disagreement with the jury verdict.

For example, the dissent states on p.2:

> Moreover, neither Matthews nor Myrick's office added to the list the recently purchased 1989 Barko 775 fellerbuncher.

And on p.2:

> There is no evidence that Myrick made any request or provided any information to Johnson Insurance Associates or to Prime Insurance to insure the 1989 Barko 775 fellerbuncher.

And on p.4:

> There is not one scintilla of evidence to support the notion that a *misdescription* was involved. (Italics in original.)

Those statements of fact just above quoted are a key to the dissent and are belied by the record and especially by the testimony of Mrs. Rivers, Myrick's secretary, which was admitted without objection:

> I, Caroline Harper [now Rivers] called Greg Matthews at American Interstate Insurance on August twenty-eight, nineteen ninety-eight to inform him of three pieces of equipment that needed to be insured for Palmetto Logging. The equipment included a Barko 775 with the serial number 17109; a Timberjack 450A with the serial number 355147; and a Hood 2400 with the serial number 243399. I spoke personally to Greg Matthews and he has acknowledged the phone conversation to Jimmy [Myrick].

J.A. 186-87.

Along the same line are the statements of the dissent with respect to materiality of the risk to the insurance company. On p.5 is the statement:

> The majority also assumes that the "misdescription" was not material to Prime Insurance's underwriting risks. Yet, the only evidence on materiality is to the contrary.

Even if a part of Day's testimony could be construed as does the dissent, it is doubtful at best. The dissent omits quoting or consideration of those parts of Day's testimony in which he accepts that Prime Insurance should pay the claim if a mistake in the description of the fellerbuncher had been made, for example.

> Q:   So the premium in this case was based on the fellerbuncher being valued at fifty-thousand dollars?
>
> A:   I believe so. J.A. 136.

> \* \* \* \*

> Q.   If a mistake was made in describing the fellerbuncher, would you expect Prime Insurance Company or do you believe Prime Insurance Company should provide coverage if such a mistake was made?
>
> A.   Yes. J.A. 142.

Power, the insurance broker who obtained the insurance policy from Prime Insurance, also testified that the premium was based on "what you expect to get" if the insured property were destroyed.

> Q.   And that's what the premium is based on, is that correct?
>
> A.   That's correct. J.A. 302

The district court, as noted, accepted the plaintiff's understanding of the testimony and held that there was no increase in risk by the substitution of the second fellerbuncher:

> In fact at this point the evidence is that the two items were comparable, that there was no increase in risk by the addition or the substitution, I would say, of the second fellerbuncher, and therefore there does not appear to be a material change in the policy. J.A. 256-57.

Although the question of materiality is a question of fact, see *Lanham v. Blue Cross & Blue Shield, Inc.*, 526 S.E.2d 253, 255-56 (S.C. Ct. App. 2000), Prime Insurance did not even ask that the question of materiality be submitted to the jury, as it could have done. Neither has it raised the question on appeal, relying, instead, on the proposition "As a matter of law, the scheduling of items on an Inland Marine policy is material to the risk, and other items may not be substituted, *even where there is a mistake.*" Br. p.26. This is obviously the course the dissent would like to take, but it is not in accord with South Carolina law. (italics added)

V.

Accordingly, the judgment of the district court on contract damages is affirmed; the judgment of the district court with respect to punitive damages is reversed; the judgment of the district court with respect to attorney's fees is reversed; the judgment of the district court with respect to pre-judgment interest is affirmed; and the case is remanded to the district court for entry of a final order not inconsistent with this opinion.

The present award of costs in the district court apparently including attorney's fees, upon remand, the district court should reconsider the taxable costs in that court. Upon this appeal, we decide that each side will bear its own costs.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*

NIEMEYER, Circuit Judge, dissenting:

The facts presented to the jury in this case do not permit a jury reasonably to conclude that Prime Insurance Syndicate, Inc. breached its contract of insurance with Jimmy Myrick when it denied coverage for the loss by fire of Myrick's 1989 Barko 775 fellerbuncher (Serial No. 17109). The policy of insurance, that issued to "Jimmy Myrick dba Palmetto Logging" on September 2, 1998, insured a 1985 Hydro Ax 311C fellerbuncher (Serial No. 311C2377), not the 1989 Barko 775 that was destroyed on September 17, 1998. As the record demon-

strates, the 1985 Hydro Ax fellerbuncher insured by Prime Insurance was in fact the fellerbuncher that had been purchased by Donald Brandt for use in an earlier joint venture between Brandt and Myrick, and indeed Brandt was named as a loss payee in Prime Insurance's policy. When the joint venture of Myrick and Brandt failed to get off the ground, Myrick decided in July 1998 to enter the logging business by himself, purchasing the 1989 Barko 775 fellerbuncher.

The record shows that when Brandt and Myrick planned to pursue the logging business together, they intended to use the 1985 Hydro Ax fellerbuncher that had belonged to Brandt. Accordingly, on behalf of the joint venture, Myrick obtained insurance to protect the business for loss of that fellerbuncher. Indeed, a fax dated June 25, 1998, from Myrick to Gregg Matthews, Myrick's insurance agent, describes the three pieces of equipment that the joint venture of Brandt and Myrick was insuring, including the 1985 Hydro Ax fellerbuncher.

When Myrick and Brandt decided not to pursue business together, Myrick purchased another fellerbuncher — a used 1989 Barko 775 — which he reconditioned. When Myrick sought insurance from Matthews for his new business, either Matthews or Myrick's office modified the June 25 fax, by deleting a Franklin 170 skidder and substituting for it a 1986 Timberjack skidder and by adding at the top of the fax, "Jimmy Myrick, dba/Palmetto Logging," to indicate who was to be the named insured. But the fax as modified left on the list the 1985 Hydro Ax 311C fellerbuncher that had been insured earlier for the business with Brandt. Moreover, neither Matthews nor Myrick's office added to the list the recently purchased 1989 Barko 775 fellerbuncher. Thus, when the marked-up June 25 fax was used by Matthews to obtain insurance for Myrick, it did not include a request for insurance on the 1989 Barko 775.

Matthews in fact obtained insurance for Myrick's new business in the form stated in the marked-up June 25 fax. Because Matthews did not underwrite the type of insurance that Myrick needed, he contacted Johnson Insurance Associates, Inc., the agency for Prime Insurance, to obtain a binder, effective September 2, 1998. On the same day that Johnson Insurance received the information from Matthews, Johnson Insurance contacted Prime Insurance to have it issue the binder that day. Prime Insurance indeed did so and issued an insurance policy to

"Jimmy Myrick dba Palmetto Logging," effective September 2, 1998, insuring Myrick's business and equipment, *including the 1985 Hydro Ax 311C fellerbuncher*. It also named Donald Brandt as a loss payee, indicating that he had an interest in the equipment as mortgagee. Accordingly, the policy issued by Prime Insurance covered precisely the equipment that was sought to be covered by the modified June 25 fax, including the 1985 Hydro Ax fellerbuncher, *but not the 1989 Barko 775*. The description of the equipment covered by Prime Insurance was in no way a "misdescription," but rather an *accurate* description of the fellerbuncher that had been involved in the business between Brandt and Myrick. There is no evidence that Myrick made any request or provided any information to Johnson Insurance Associates or to Prime Insurance to insure the 1989 Barko 775 fellerbuncher.

The evidence shows that, by whatever mistake that Myrick or Matthews made, they insured the 1985 Hydro Ax fellerbuncher previously insured by Myrick for his joint venture, and not Myrick's 1989 Barko 775 fellerbuncher. While the facts might show that Myrick insured the wrong fellerbuncher from his point of view, the fellerbuncher insured was not "misdescribed."

Obviously, when Myrick later sought payment from Prime Insurance for loss of the 1989 Barko 775 fellerbuncher, Prime Insurance denied coverage, and properly so.

The district court let the jury in this case rewrite the insurance policy, denying Prime Insurance's motion for summary judgment, its motion for judgment during trial, and its motion for judgment as a matter of law following trial. And the majority now affirms this rewriting of the policy, despite the fact that there is not one scintilla of evidence to support the notion that a *misdescription* was involved. The 1985 Hydro Ax, including its serial number, was *correctly* described; it was simply not the fellerbuncher that Myrick purchased in July 1998 and that fire destroyed in September 1998.

The majority assumes that there was only one fellerbuncher in question and that therefore the description of a fellerbuncher in the policy had to be a "misdescription":

> We characterize what occurred in this case as a misdescription because the record reveals that Myrick owned only *one* fellerbuncher. This *fact* makes the schedule description in this case no different than a situation in which the wrong model year was listed because there can be no confusion as to which piece of equipment is referred to in the schedule — *i.e.*, Myrick's only piece of equipment.

*Ante* at 11 n.10. This, of course, overlooks the fact that there were two different fellerbunchers and that the fellerbuncher that Myrick actually insured, albeit by mistake, was the fellerbuncher that he had previously insured as part of his business with Brandt. His mistake is further confirmed by the fact that Myrick had Prime Insurance list Brandt as an additional loss payee.

Thus, at bottom, Myrick insured *the wrong property* through a mistake that occurred somewhere between Myrick's office and Gregg Matthews' office. But the mistake of insuring the wrong fellerbuncher is not the same as a "misdescription" of a single fellerbuncher.

The majority also assumes that the "misdescription" was not material to Prime Insurance's underwriting risks. Yet, the only evidence on materiality is to the contrary. First, not only were the two fellerbunchers different models and different brands, but they were also of different ages. In addition, the 1989 Barko 775 fellerbuncher that Myrick purchased in July 1998 was not working and had to be reconditioned at a cost of $8000 - 9000. The only witness to testify directly about the relative risks, Roger Day, an officer of Prime Insurance, stated that the underwriting risks for the two machines were different. When questioned by Myrick's counsel to suggest that both fellerbunchers had a similar value and therefore would have been insured for the same premium, Day rejected the suggestion, stating that one could not draw such a conclusion. Obviously different machines of different ages and conditions pose different risks. Because this was the only evidence with respect to materiality, Myrick failed to carry his burden of proving that there was no material difference in underwriting risk for insuring the two fellerbunchers.

I believe it is fundamentally unjust to allow a judgment to be entered against Prime Insurance for loss of the 1989 Barko 775 when

it issued a policy — in the form exactly as requested — insuring only the 1985 Hydro Ax fellerbuncher that had been part of the business between Myrick and Brandt and which was *correctly* described. Accordingly, I respectfully dissent.