**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 12-2477**

---

VICKY T. BENNETT,

              Plaintiff - Appellee,

         v.

CSX TRANSPORTATION, INCORPORATED,

              Defendant - Appellant.

---

**No. 12-2556**

---

VICKY T. BENNETT,

              Plaintiff - Appellee,

         v.

CSX TRANSPORTATION, INCORPORATED,

              Defendant - Appellant.

---

Appeals from the United States District Court for the Eastern
District of North Carolina, at Raleigh.  Terrence W. Boyle,
District Judge. (5:10-cv-00493-BO)

---

Argued: October 29, 2013          Decided: January 21, 2014

---

Before TRAXLER, Chief Judge, and WILKINSON and FLOYD, Circuit
Judges.

---

Reversed and remanded by unpublished per curiam opinion.

———————————

**ARGUED**: Evan Mark Tager, MAYER BROWN, LLP, Washington, D.C., for Appellant.  William Mullins McLeod, Jr., MCLEOD LAW GROUP, LLC, Charleston, South Carolina, for Appellee.  **ON BRIEF**: Scott S. Cairns, MCGUIRE WOODS LLP, Jacksonville, Florida; John C. Millberg, Meredith E. Woods, MILLBERG GORDON STEWART PLLC, Raleigh, North Carolina; Miriam R. Nemetz, Scott M. Noveck, MAYER BROWN LLP, Washington, D.C., for Appellant.  Julie L. Moore, MCLEOD LAW GROUP, LLC, Charleston, South Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Appellee Vicky T. Bennett, an African-American woman, sued her former employer, Appellant CSX Transportation, Inc. (CSX), for violations of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and state common law, alleging that she was subjected to discriminatory and negligent acts while employed as a conductor trainee at CSX. Thereafter, CSX filed a motion for summary judgment as to all claims. The district granted the motion as to Bennett's state claims but allowed the federal claims to go forward.

At trial, the jury returned a verdict for CSX on the FELA claim, but found for Bennett on the Title VII claim. The jury awarded to Bennett $150,000 in compensatory damages. Pursuant to a post-trial motion filed by Bennett, the district court also awarded Bennett back pay and front pay, as well as attorneys' fees and costs. Post-trial, CSX filed a renewed motion for judgment as a matter of law or, in the alternative, a new trial and/or to amend judgment, which the district court denied.

CSX subsequently filed two timely appeals: the first with regard to the district court's award of attorneys' fees and costs and the second with regard to the district court's judgment against CSX, denial of CSX's renewed motion for judgment as a matter of law or, in the alternative, a new trial,

3

and/or to amend judgment, and all other rulings adverse to CSX. Thereafter, we consolidated the two appeals. Our jurisdiction over the appeals is pursuant to 28 U.S.C. § 1291. For the reasons that follow, we reverse the judgment of the district court and remand for entry of judgment in favor of CSX.

I.

Bennett reported to CSX's Rocky Mount terminal for her first day of work on August 18, 2008, as part of her on-the-job training to be a train conductor. During the session, Trainmaster James Gilbert gave Bennett a work schedule that he had prepared. After reviewing the schedule, Bennett noted that it would require her to work a longer period of time than is allowed under the Hours of Service Act (the Act), 49 U.S.C. § 21101. The Act mandates that railroad workers work no more than twelve consecutive hours and receive at least ten hours of rest between shifts, excluding time in transit. 49 C.F.R. § 288.19(a)(1)-(2) pt. 228 app. A. Thus, Bennett spoke to Gilbert, and he sought to remedy the problem by providing Bennett with a new schedule. Bennett realized that, even with the reconfigured schedule, she would still be required to work longer hours than the Act allows. Hence, she returned to Gilbert a second time, but he was on the telephone so he instructed her to call later.

4

After several unsuccessful attempts to speak with Gilbert, Bennett contacted Lorenzo Wilkins to help remedy the scheduling problem. Wilkins was the Manager of Conductor Training, whose main responsibilities included hiring, assisting in training, and supporting the new hires until their two-year anniversary.

Thereafter, Gilbert returned Bennett's call. According to Bennett's statement, Gilbert asked her why she contacted Wilkins. After she answered that she still had a scheduling conflict after Gilbert had attempted to correct it, Gilbert responded: "You [b]elong to Rocky Mount now and [Wilkins] does [n]ot run this terminal[.] [H]e is only an aide to us[.] Do you understand [l]ady? . . . I am you[r] direct supervisor and you are no longer to contact [W]ilkins for anything[.] . . . Is that understood?" She answered that she did.

On August 22 and 23, Bennett was scheduled to work at the CSX terminal in Fayetteville, North Carolina. When she asked Gilbert for directions to the train yard, he told her that he was unfamiliar with Fayetteville, but that he would text the trainmaster's telephone number so that she could ask for directions from him. After receiving the name of the trainmaster—Ed Howze—Bennett telephoned him, and he gave her directions. But, the next morning on her way to the yard, Bennett telephoned Howze again and told him that she was lost. Thereafter, according to Bennett, "[Howze] became very irritated

5

so [she] told him [she] would continue trying and call back if needed. A few minutes passed [and she] called . . . Howze back. [H]e screamed[,] [']Open [b]oth [y]our [f]ucking [e]yes [l]ady and [y]ou [w]ill [s]ee.[']" She then telephoned Wilkins, who gave her directions to the train yard.

After Bennett arrived at the train yard, Howze drove up and told her to "get in the truck." She testified that she did as she was told to do but, because she was scared, she left her door open and her foot hanging out of the truck. She pulled her foot in and closed the door, however, as he accelerated. After asking several times where they were going, Howze finally answered, "I'm going to teach you directions." According to Bennett, "[w]hile driving he continuously talked rude and said things like ['][W]ho do you think you are by calling a Rocky Mt. Trainmaster['] and ['][Y]ou will never work my railroad.[']"

After they arrived at the hotel where Bennett had stayed the previous night, Howze demanded, "[L]et's see you get me back now lady." She explained to him that she had left the directions in her bag. Thereafter, he drove her back to the train yard and then, according to Bennett, "asked which was [her] vehicle, stopped in front of it and opened his trunk and said[,] '[G]et your belongings and leave my railroad.'"

On August 25, 2008, one day before a mandatory meeting was to be held with CSX management so that the aforementioned issues

6

could be addressed, Bennett's vehicle was vandalized. She had parked it at the employee parking lot of the Rocky Mount yard. While working the midnight-to-noon shift, someone spray-painted the messages "Stay of[f] the railroad" and "stupid nigga nigga" on her car. Someone had also broken the rear passenger-side window of her vehicle and placed a female mannequin head in the backseat with its face painted black and a rope around its neck. After the vandalism incident, the mandatory meeting was cancelled.

Neither CSX's police, its human resources department, nor the Rocky Mount Police Department was able to determine who committed the vandalism. During CSX's investigation, Bennett was placed on a paid leave of absence. Although she was scheduled to return to work on October 1, 2008, she did not do so, stating that she was unable to return to work for medical reasons. In late November 2008, Bennett's training class was furloughed. CSX subsequently sent the class a letter on July 26, 2010, recalling them to work. Bennett failed to respond.

Based on the aforementioned incidents, Bennett filed suit in the District of South Carolina, claiming violations of FELA and Title VII. She also brought several state-law tort claims, including intentional infliction of emotional distress; negligent infliction of emotional distress; negligent hiring,

7

supervision, and retention; false imprisonment; and simple assault. CSX subsequently filed a motion to transfer the action to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404, which the South Carolina district court granted.

Thereafter, CSX filed a motion for summary judgment as to all of Bennett's claims. The district court granted the motion as to Bennett's state-law tort claims but denied it as to her two federal claims.

At trial, the jury found for CSX on the FELA claim but for Bennett on the Title VII claim. It awarded Bennett $150,000 in compensatory damages. The district court awarded her an additional $92,835 in back pay and $592,869 in front pay, $327,423.15 in attorneys' fees and costs to Bennett's trial counsel, and $469,528.24 in attorneys' fees and costs to Bennett's prior law firm. Thereafter, CSX filed a post-trial motion, which included, among other things, a renewed motion for judgment as a matter of law on Bennett's Title VII claim. The district court denied the motion.

## II.

In CSX's first assignment of error, CSX claims that the evidence presented at trial was insufficient for the jury to find that CSX subjected Bennett to a hostile work environment.

8

Thus, according to CSX, the district court erred in denying its renewed motion for judgment as a matter of law.

We review the district court's denial of a motion for judgment as matter of law de novo. Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 164 (4th Cir. 2012). When considering such a motion, the court construes the evidence in the light most favorable to the non-movant. Int'l Ground Transp. v. Mayor & City Council of Ocean City, Md., 475 F.3d 214, 218 (4th Cir. 2007).

The correct standard for granting a motion for judgment as a matter of law is well-settled: "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture, judgment as a matter of law must be entered." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). But, "[i]f the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." Id. at 489-90. "Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982)

9

(alternation omitted) (quoting Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir. 1958)) (internal quotation marks omitted). "[E]vidence which shows a 'probability' and not a mere 'possibility' would suffice to allow jury consideration." Id. at 241 (quoting Raston Purina Co. v. Edmunds, 241 F.2d 164, 168 (4th Cir. 1957)).

Bennett seeks to impute liability for her hostile work environment claim to CSX on the basis of the alleged acts of two of her supervisors: Howze and Gilbert. To establish a hostile work environment claim under Title VII, the plaintiff must demonstrate "that the offending conduct (1) was unwelcome, (2) was because of her sex [or race], (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011) (alteration in original) (quoting Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008)) (internal quotation marks omitted). To establish the third element, the plaintiff must show that the work environment was not just subjectively hostile but objectively hostile, as well. Id. at 385. "Such proof depends upon the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

10

employee's work performance.'" Id. (quoting EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008)).

In denying CSX's renewed motion for judgment as a matter of law, the district court held that Bennett set forth "ample circumstantial evidence" that Howze and Gilbert "vandalized her vehicle and subjected her to a hostile work environment." Bennett v. CSX Transp., Inc., 907 F. Supp. 2d 694, 698 (E.D.N.C. 2012). Although Bennett "did not present any direct evidence that . . . Gilbert or . . . Howze vandalized her car, circumstantial evidence is often utilized in cases involving discrimination, and may in such circumstances be more persuasive than direct evidence." Id.; see Desert Palace, Inc. v. Costa 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." (quoting Rogers v. Mo. Pac. R.R. Co., 352 U.S. 500, 508, n.17 (1957))).

Moreover, according to the district court,

> [Bennett] further presented sufficient evidence that the harassment she withstood was both severe and pervasive. [Bennett] proffered evidence that, inter alia, she was one of only two African American women in her place of employment, that she received negative performance assessments where employees of a different race and gender had not, that her car was vandalized with a message to stay of[f] the railroad and a racial slur, and that a mannequin head with a noose around its neck was placed in the backseat of her car.

Bennett, 907 F. Supp. 2d at 698.

11

We agree with the proposition that "circumstantial evidence is often utilized in cases involving discrimination, and may in such circumstances be more persuasive than direct evidence." Id. We are unpersuaded, however, that there was "ample circumstantial evidence" demonstrating that Howze and Gilbert vandalized Bennett's car and subjected her to a hostile work environment.

Although CSX may have treated Bennett unfairly with reference to both the schedule and the directions issues, without the vandalism incident, she appears to agree that she would have no hostile work environment claim. After all, rude treatment by supervisors is "conduct falling short of that required to sustain a hostile work environment." Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006). It is not the province of Title VII to eliminate every instance of rudeness or insensitivity. Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772-73 (4th Cir. 1997). "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life." Sunbelt Rentals, Inc., 521 F.3d at 315.

Turning to the vandalism incident, Bennett argues that the vandalism of her car was "the climactic event to occur in a

12

progressively hostile environment" at CSX. She also contends that she was "specifically targeted" and that Howze and Gilbert "each had a motive to vandalize [her] car." Both Howze and Gilbert were upset, she maintains, because she had contacted Wilkins about their conduct toward her and the meeting that they were going to be required to attend as a result of that conduct. According to Bennett, "It was clear . . . that they did not want . . . [her] working for CSX."

Bennett further maintains that both Howze and Gilbert had control over the facility, access to Bennett's vehicle, knowledge of her work schedule and thus, according to her, "a level of comfort that [they] could vandalize both sides of . . . Bennett's vehicle in plain view of the CSX yard office and not get caught."

In addition to motive, Bennett argues that "the circumstantial evidence that . . . Howze and/or . . . Gilbert [were] responsible for the vandalism is undeniable." In support, she marshals the following evidence: (1) the vandalism occurred the night before the mandatory meeting mentioned above; (2) Bennett's vehicle was parked in a well-lit lot 200 feet from the door of Gilbert's office and was easily seen from the Rocky Mount tower all evening; (3) there were no other cars vandalized in the CSX parking lot that night; (4) the vandal was familiar with Bennett's schedule; (5) given that Bennett's car was spray-

painted in large, block-print letters suggests that the vandal was not in a hurry but instead comfortable enough to take his time; (6) the message spray painted on Bennett's vehicle—"Stay of[f] the railroad . . . stupid nigga nigga"—was the same message that Howze and Gilbert conveyed to Bennett the previous week; (7) the vandal did not take anything from Bennett's car; (8) based on the message spray-painted on Bennett's vehicle and the female mannequin head with the rope around its neck in her back seat, the vandal knew that Bennett was African-American and that she worked on the railroad; (9) Gilbert's vehicle was identical to Bennett's so the vandal knew which of the two vehicles belonged to Bennett; (10) the vandal's use of white paint shows that the vandal was targeting a black vehicle; (11) the vandal used ballast from the train tracks to break Bennett's vehicle window; (12) the Rocky Mount Police Department, which conducted its investigation at 5:00 AM, did not mention the mannequin head in the back seat, but Brian Stussie, another manager at CSX, mentioned seeing it at 11:48 AM, suggesting that the vandal felt comfortable in returning to the scene to complete the vandalism; (13) Gilbert never contacted Bennett after the vandalism was discovered to inform her of the vandalism or insure her safety; (14) Bennett was not on the training schedule that Gilbert sent out on the night that the vandalism occurred, indicating that he did not think that

14

she would return to work after the incident; (15) Gilbert told the Rocky Mount Police Department that he observed a Dodge Charger park beside Bennett's car and then drive away, but at trial Gilbert denied making the statement; (16) there were significant discrepancies in the statements with respect to when Gilbert was made aware of the vandalism, who informed him, and when he was informed that it was Bennett's car that had been vandalized; and, (17) in exchange for favorable treatment from CSX, James Bradley, a general clerk at CSX's Rocky Mount yard, gave much more detailed information in his deposition and at trial, which supported CSX, than he did in his initial statement to the Rocky Mount Police Department.

As is evidenced above, Bennnett adopts a kitchen-sink approach in her attempt to fix the vandalism incident on Howze and Gilbert. For the reasons set forth below, however, we conclude that Bennett's circumstantial evidence was insufficient to establish a reasonable probability that either Howze or Gilbert committed the vandalism detailed herein.

Pertaining to Bennett's argument that requiring Howze and Gilbert to attend the mandatory meeting is circumstantial evidence that one of them vandalized her vehicle: as CSX observed, "no rational jury could infer that either [Gilbert or Howze] would jeopardize a well-paying, long-term career and open himself up to criminal prosecution over something as

15

insignificant as a meeting to resolve an issue about interpersonal relations." Although we think that a reasonable jury could rightly infer from the evidence presented herein that Howze and Gilbert disliked Bennett, we do not think such an inference could reasonably lead to a conclusion that either of the men probably criminally vandalized her vehicle. See Hawkins v. PepsiCo, Inc., 203 F.3d 274, 281 (4th Cir. 2000) ("Even if [Howze and Gilbert] harbored some personal dislike of [Bennett] that made [Bennett's] job more difficult or stressful, '[a]n employer is not required to like his employees.'") (fourth alteration in original) (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989))).

As to the proximity of Bennett's car to Gilbert's office, no reasonable jury would infer from that fact that Howze and/or Gilbert were probably responsible for the vandalism of Bennett's vehicle. Only sheer speculation on the jury's part could allow it to come to such a conclusion. And, that evidence certainly does not point to the probability that they committed the criminal act.

At least five of the pieces of evidence that Bennett sets forth to establish that Howze and Gilbert vandalized her car are facially neutral. No reasonable jury would find from the fact that there were no other cars vandalized in the CSX parking lot on the night that Bennett's car was vandalized or that the

16

vandal did not take anything from her car as probative on the question as to whether Howze and Gilbert probably vandalized Bennett's car. The same goes for Bennett's statement that Gilbert never contacted her after the vandalism. Again, neither rudeness nor insensitivity is actionable under Title VII. Hartsell, 123 F.3d at 772-73. Bennett's contention that Gilbert told the Rocky Mount Police Department that he observed a car parked beside Bennett's car and then drive away, but then denied it at trial, and the discrepancies in the statements regarding when Gilbert discovered the vandalism are also both facially neutral and thus, are of no assistance to Bennett in her hostile work environment claim. Quite simply, they are of no consequence.

Several of Bennett's contentions could just as easily be attributed to any other employee at CSX as they could be to Howze and/or Gilbert. This is especially true as to the vandal's familiarity with Bennett's work schedule, the vandal arguably taking his time in painting large letters on Bennett's vehicle because he was in no hurry, the message on Bennett's vehicle to stay off of the railroad, the vandal's knowledge that Bennett was an African-American woman who worked on the railroad, the identity of Bennett's vehicle as opposed to Gilbert's vehicle, and Bennett having a black car that would make the use of white paint preferable. The use of ballast to

17

break Bennett's vehicle window and the appearance of the mannequin after the vandalism was first discovered could also point as easily to Bennett's co-workers as they could to Howze and Gilbert. For a jury to find that this evidence leads to the conclusion that Howze and Gilbert are the vandals, instead of someone else, was based on nothing more than speculation and conjecture.

Concerning Gilbert leaving Bennett off of the training schedule for the following week, the evidence shows that he was to meet with her the following day about her schedule and other matters. Thus, no reasonable jury could infer from Bennett being left off of the training schedule that Howze and/or Gilbert probably had vandalized Bennett's car.

Finally, in the matter of Bradley, in his initial statement to police, he said that he noticed a light-colored Dodge Charger or Magnum that he did not recognize in the Rocky Mount CSX parking lot on the night of the vandalism. But, then at trial, he testified that he also saw a light-skinned African-American standing beside the car. Bennett maintains that Bradley embellished his testimony for CSX in exchange for favorable treatment by the company. Although we are at a loss to understand why Bradley failed to reveal the information about the man in the parking lot in his statement to police—be it that he simply forgot or for some nefarious reason—the fact remains

that he has maintained from the start that he observed an unfamiliar car in the parking lot on the night that the vandalism occurred. That he later remembered that there was a strange man there, too, is of no import.

Having reviewed Bennett's circumstantial evidence both individually and cumulatively, we hold that, although Bennett demonstrated that there is a possibility that Howze and/or Gilbert vandalized her vehicle, she failed to establish that there is a reasonable probability that they did so. Thus, the only verdict that a reasonable jury could have rendered on Bennett's hostile work environment claim is one in favor of CSX. As such, the district court erred in not granting CSX's renewed motion for judgment as a matter of law.

### III.

CSX halfheartedly argues in a footnote that, pursuant to Vance v. Ball State University, 133 S. Ct. 2434 (2013) (holding that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim"), "[i]t does not appear that Gilbert or Howze would qualify as supervisors under the proper standard." Inasmuch as Bennett is unable to establish that Gilbert or Howze was responsible for the vandalism of Bennett's vehicle, however, we

19

need not decide whether they were Bennett's supervisors pursuant to <u>Vance</u>.

IV.

From the circumstantial evidence Bennett presented, no reasonable jury could have concluded that Howze and/or Gilbert vandalized Bennett's vehicle. Any such finding was based purely on speculation and conjecture. Thus, the district court erred in not granting CSX's renewed motion for judgment as a matter of law. Accordingly, we reverse the judgment of the district court. In light of this reversal, we also reverse the front and back pay awards, as well as the attorneys' fees awards, and remand the case with instructions to the district court to enter judgment in favor of CSX.

<u>REVERSED AND REMANDED</u>